# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| RICKY R. FRANKLIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action File No.: |
| v. | § | 1:20-CV-01410-MLB-WEJ |
| | § | |
| CENLAR FSB d/b/a CENTRAL LOAN | § | |
| ADMINISTRATION AND | § | |
| REPORTING (CENLAR) and | § | |
| CARRINGTON MORTGAGE | § | |
| SERVICES, LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT CENLAR FSB'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

In support of its Motion for Summary Judgment, Defendant Cenlar FSB d/b/a Central Loan Administration Reporting ("Cenlar"), respectfully submits the following Memorandum of Law:

### I.    INTRODUCTION

Plaintiff Ricky Franklin ("Plaintiff" or "Franklin") has for many years manufactured lawsuits against companies like Cenlar under the Telephone Consumer Protection Act ("TCPA") using strategies designed to entrap and then sue them for money. He has for brought these lawsuits and has routinely extorted

settlements from defendants anxious to avoid the tremendous costs of litigation. In this case, however, Franklin's efforts have gone too far and judgment should be decided against him as he has destroyed evidence and deliberately attempted to exploit a statute designed to protect consumers for his own ill-gotten gain.

In short, Mr. Franklin is a serial litigator who knows what evidence will be important to support his claims and what evidence would be required for companies like Cenlar to defend against them. Yet, he has destroyed that evidence and what is left creates no genuine issue of material fact to be decided by a finder of fact. Even if the Court were to consider all of the evidence, to include Plaintiff's self-serving testimony, judgment for Cenlar is proper because Plaintiff provided Cenlar his express consent to call his cellular phone and never expressly, or clearly, revoked or modified that consent prior to receiving any calls from Cenlar. Specifically, Franklin told Cenlar "you can call my cellphone, but I don't want to receive calls using an 'autodialer.'" But Cenlar never called Franklin using an autodialer. Accordingly, Cenlar is entitled to judgment in its favor as a matter of law.

## II.     PROCEDURAL POSTURE AND STATEMENT OF FACTS

There is only one (1) claim remaining in this action against one defendant, Cenlar. (Statement of Undisputed Material Facts, "UMF," ¶ 1, served herewith, Doc. 34, Second Amended Complaint ("SAC"), and Doc. 51.) The only remaining claim

is Plaintiff's claim against Cenlar under The Telephone Consumer Protection Act, 47 U.S.C. §§ 227, et. seq. ("TCPA") (UMF, ¶ 2, Doc. 34, 51.) All other claims and other defendant in the case have been dismissed by previous orders of the Court. (UMF, ¶ 3, Doc. 51, 58.) In the claim still pending, Plaintiff has alleged only that Cenlar "contacted" him "over 62 (sixty-two) times by means of artificial pre-recorded voice messages to a cellphone or pager in violation of 47 U.S.C. § 227(b)(1)(A)(iii)." (UMF, ¶ 4, Doc. 34, ¶ 52.)

Plaintiff's SAC is devoid of any claim against Cenlar for using an automatic telephone dialing system, or ATDS, as that term is defined in 47 U.S.C. § 227(a)(1). (UMF, ¶ 5, *see generally* Doc. 34, SAC.) Cenlar did not use an ATDS to call Plaintiff's cell phone because Cenlar does not use a telephone dialer system that has the capacity to store or produce telephone numbers to be called, using a random or sequential number, and dial those numbers. (UMF, ¶ 6, Declaration of Justin Singmaster, hereinafter, "Singmaster Decl.," ¶ 2.) The dialer system used by Cenlar throughout 2019 and 2020, Harmony Version 7.1 by Noble Systems (the "System"), does not have the capacity to store or produce, using a random or sequential number generator, numbers to be called. (UMF, ¶ 7, Singmaster Decl., ¶ 3.)

Instead, the only telephone numbers Cenlar and its System are able to, and in fact, dial are actual customer telephone numbers from Cenlar's files that are

onboarded onto Cenlar's call lists and any telephone numbers that a Cenlar agent manually types in the case of a manual dial. (UMF, ¶ 8, Singmaster Decl., ¶ 4.) Thus, the System neither stores nor produces numbers using a random or sequential number generator. (UMF, ¶ 9, Singmaster Decl., ¶ 5.) Accordingly, none of the telephone calls made to Plaintiff's cellular phone at issue in this matter ending in 3733 were made using an autodialer or automatic telephone dialing system which has the capacity either to store a telephone number to be called using a random or sequential number generator or to produce a telephone number using a random or sequential number generator. (UMF, ¶ 10, Singmaster Decl., ¶ 6.)

On October 24, 2019, Plaintiff called Cenlar and advised Cenlar not to add his cell phone number to his file. (UMF, ¶ 11, Doc. 34, ¶ 17.) On November 15, 2019, Plaintiff called Cenlar and the following conversation took place:

```
14·        FEMALE VOICE:· No problem.· Are you the
15·     authorized primary user on this cell phone
16·     number?
17·        MR. RICKY R. FRANKLIN:· Yes, I am the
18·     authorized user.
19·        FEMALE VOICE:· All right.· And do we
20·     have your permission to contact you at that
21·     number in the event we need to reach you?
22·        MR. RICKY R. FRANKLIN:· Yeah.· You-all
23·     can call me.· Well, yeah, uh-huh.
24·        FEMALE VOICE:· Okay.· And please be
25·     advised that calls may be made from an

1·      automatic dialer, and what did you say the --
2·         MR. RICKY R. FRANKLIN:· Well, I don't
3·      -- I don't -- I don't want automatic dialer.
4·         FEMALE VOICE:· Okay.· All right.· So
5·      I'll go ahead and add the -- add that number,
6·      and no calls.· Okay.
```

```
 7·        MR. RICKY R. FRANKLIN:· No.· I didn't
 8·    say --
 9·        FEMALE VOICE:· Well, no calls from an
10·    automatic dialer.· Okay.· All right.· And –
```

(UMF, ¶ 12, Franklin Depo., pp. 146, l. 14-25, p. 147, l. 1-10.) Franklin confirmed

at his deposition that he gave Cenlar permission to call his cell phone but not with

an autodialer:

```
12·    Q·    Well, but you consented to them calling
13·  you, and you said you don't want an auto dialer;
14·  right?
15·    A·    Right.
```

(UMF, ¶¶ 13, 17, Franklin Depo., p. 156, l. 12-15, p. 176, l. 4-20.) Importantly,

Franklin never limited his consent further. Specifically, he never told Cenlar not to

call him using pre-recorded or artificial recordings. Plaintiff confirmed this at his

deposition when he testified as follows:

```
14·    Q·    Okay.· So you provided -- said they can
15·  call your cell phone, but you don't want them to
16·  call you with computer automated calls?· Is that
17·  your testimony?
18·    A·    That is correct.
19·    Q·    Did you ever tell Cenlar not to call
20·  you with an artificial voice?
21·    A·    I'm not sure.
22·    Q·    Did you ever tell them to not use a
23·  prerecorded voice when they called you?
24·    A·    Not -- I don't -- I'm not sure about
25·  that either.
 1·    Q·    Do you recall ever telling them to not
 2·  call you with an artificial voice?
 3·    A·    No, I don't recall that.
```

(UMF, ¶ 14, Franklin Depo., p. 126, l. 14-19, p. 127, l. 1-3.) Finally, Plaintiff

confirmed that he was fully aware of how to stop the calls from Cenlar if he no

81177232.16

longer wanted to receive them, but that he had only done so prior to November 15, 2019:

> 4· · · Q· · · You could have at any time explicitly
> 5· told Cenlar to stop calling your cell phone by any
> 6· means; right?
> 7· · · A· · · I did.
> 8· · · Q· · · When did you say that?
> 9· · · A· · · I said, I didn't want any auto-dialed
> 10· calls and I prefer the calls manually.
> 11· · · Q· · · Yeah.· I'm asking you when did you
> 12· explicitly tell them not to call your cell phone at
> 13· all?
> 14· · · A· · · When I sent the letters, four of them,
> 15· that said, contact me through mail only.
> 16· · · Q· · · Okay.· So all of those letters were
> 17· prior to you telling them they could call you on
> 18· your cell phone on November 15 but just don't use an
> 19· auto dialer; right?
> 20· · · A· · · That is correct.

(UMF, ¶ 13, Franklin Depo., p. 176, l. 4-20.)

Instead, after providing consent to call him on November 15, 2019, on December 5, 2019, Plaintiff wrote Cenlar a deliberately vague letter and advised as follows: "If your company needs to call me, I **_prefer_** that you call manually or with a live person versus these unwanted automated generated calls to my cellphone." (UMF, ¶ 15, Franklin Depo., Ex. 9, p. 14, emphasis supplied.)[1] The December 5 letter contains the following passage:

---

[1] The only evidence in this case that his December 5, 2019 letter was actually ever delivered to Cenlar is Plaintiff's own self-serving testimony. (UMF, ¶ 18, Franklin Depo., p. 172, l. 1-12.)

> 1.  I refer to several calls I received from your company specifically on December 3rd and 4th 2019.  I was called by a computer or automated message that I did not consent to receive.  If your company needs to call me, I prefer that you call manually or with a live person versus these unwanted automated generated calls to my cellphone.
>
> 2.  In the past I've asked your company to contact me by mail only for any correspondence.

(UMF, ¶ 16, Franklin Depo., Ex. 9, p. 14.)

Plaintiff admits that he is familiar with the TCPA requires and prohibits, and he elected not to use any of the terms therein:

```
 5·     Q·     Well, you've filed 24 lawsuits
 6· alleging, you know, violations of the TCPA.· The
 7· TCPA prohibits auto dialer, prerecorded voice, or
 8· artificial voice.· Why wouldn't you use those terms
 9· if you don't want them to call you that way?
10·     A·     I used the terms that I used.
11·     Q·     But you're very familiar with what the
12· statute requires; right?
13·     A·     I guess you can say that.
```

(UMF, ¶ 21, Franklin Depo., p. 165, l. 5-13.) Plaintiff admitted at deposition to studying the cases, understanding the language in the statute, and to having a thorough understanding of the interpretations issued by the FCC as to how dialers work and what could constitute violations of the TCPA. (UMF, ¶ 22, Franklin Depo., pp. 95, 97-99, 221-222.) Plaintiff testified that he is aware that there are two explicitly prohibited practices under the TCPA, but when asked about his use of the phrase "unwanted automated generated" calls in the letters he sent to Cenlar he could only point to the use of the word "automated" in the heading above the prohibited

practices in the TCPA. (UMF, ¶ 23, Franklin Depo., pp. 107, l. 24-25, 108, l. 1-8, 169, l. 1-25, 170, l. 1-19.)

When questioned at his deposition why he *__again__* sent the exact same letter (dated December 5, 2019) in March 2020 to Cenlar, Plaintiff offered nothing of substance. (UMF, ¶ 24, Franklin Depo., pp. 173-179.) When it was suggested to Plaintiff that he could have at any time simply explicitly asked Cenlar to stop calling him, he admitted that he had done this in four letters prior to November 15, 2019. (UMF, ¶ 25, Franklin Depo., p. 176, 1. 11-15.) Just like the prior lawsuit in which he claimed damages for "unwanted" text messages and could have simply "opted-out" by following the explicit instructions provided to him, he knew how to stop the calls but chose not to. (UMF, ¶ 26, Franklin Depo., pp. 73, l. 23-25, 74, l. 1-14.) When asked at his deposition why he didn't just do this, Plaintiff, a serial filer, testified that he "told [Cenlar] what he wanted to tell [Cenlar]."

```
5·    Q·   Yes.· Why didn't you just tell them, I
6· don't want you to call my cell phone anymore?
7·    A·    Because I told them what I wanted to
8· tell them.· I mean, I don't know how to answer your
9· question.
```

(UMF, ¶ 20, Franklin Depo., p. 157, l. 5-9.)

And in any event, all of the calls complained of by Plaintiff in the SAC occurred after he had provided consent in November 2019, and none were made using an autodialer. (UMF, ¶¶ 6, 19, Franklin Depo., Ex. 10.) Then, to further

illustrate his gamesmanship, after the "unwanted" calls from Cenlar stopped in March 2020, Plaintiff provided once again provided Cenlar his express consent to start calling him on his cell phone without any limitation at all! (*See* UMF, ¶ 27, Franklin Depo., pp. 234-235, Ex. 16 thereto.) For the reasons below, Cenlar is entitled to judgment as a matter of law on Franklin's bogus TCPA claim.

## III.     LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Importantly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–248 (emphasis in original). While it is true that testimony can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated, that is not the case where "overwhelming evidence exists that contradicts the self-serving testimony." *See U.S. v. Stein*, 881 F.3d 853, 858-59 (11th Cir. 2018); *Brown v. Public Health Trust of Miami-Dade Cty.,* Case No. 1:18-cv-

81177232.16

21457-UU, 2018 WL 10760075, *13 n.3 (S.D. Fla. Dec. 18, 2018); *see also Brock*

*v. Bank of America, N.A.,* Case No. 2:11-cv-00083-RWS, 2012 WL 1802315, at *3

(N.D. Ga. May 17, 2012) ("Given the record as a whole, and the overwhelming

evidence contradicting Plaintiff's allegations, no reasonable jury could find in

Plaintiff's favor.").

A party opposing summary judgment "may not rest upon the mere allegation

or denials of his pleading, but . . . must set forth specific facts showing that there is

a genuine issue for trial," and "must present affirmative evidence in order to defeat

a properly supported motion for summary judgment." *Anderson*, 477 U.S. 242, 256–

57. "[T]he nonmoving party must 'do more than simply show that there is some

metaphysical doubt as to the material facts.'" *Matsushita Elec. Indus. Co., v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.    ARGUMENT

### A. Plaintiff got rid of the evidence critical to his claims and Cenlar's defenses.

In Cenlar's companion Motion for Sanctions and the supporting legal

memorandum,[2] it has outlined for the Court why this case should be dismissed with

prejudice due to Plaintiff's spoliation of vital evidence. (*See* Motion for Sanctions,

---

[2] Cenlar has filed a Motion for Leave to file the Motion for Sanctions in accordance
with case law in this District.

served contemporaneously herewith.) If the Court were to strike, exclude, or otherwise disallow Plaintiff's "call log," or alleged copies of voicemails he received, as a sanction lesser than outright dismissal in light of Plaintiff's spoliation of evidence then Plaintiff would have no "evidence" to corroborate any of his self-serving testimony with regard to his manufactured TCPA claim.[3] Even if the Court chooses not to dismiss the TCPA claim for Plaintiff's spoliation of evidence or strike or otherwise disallow the call log as "evidence" in the case going forward, Cenlar is still entitled to summary judgment in its favor as shown below.

### B. Plaintiff's TCPA claim fails in any event.

#### 1. The TCPA

The TCPA prohibits "any call . . . using any automatic telephone dialing system *or* an artificial or prerecorded voice" to "to any telephone number assigned to a . . . or cellular telephone service" without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A) (emphasis supplied).[4] The TCPA defines an "automatic telephone dialing system" (or "ATDS") as "equipment which has the

---

[3] Indeed, it is Cenlar's position that Plaintiff actually destroyed the evidence (his cell phone and computer, among other things) that would refute his testimony and prove his claims are wholly without merit.

[4] As Plaintiff is well aware, the TCPA also prohibits phone calls made using an automatic telephone dialing system without the recipient's consent. Indeed, in this case, Plaintiff provided his express consent for Cenlar to call him on his cell phone but expressly excluded calls using an "autodialer." (*See* UMF, ¶ 13.)

81177232.16

capacity -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). An ATDS is commonly referred to as an autodialer. *See Facebook, Inc. v. Duguid,* 141 S. Ct. 1163, 1167, 209 L. Ed. 2d 272 (2021). The penalty for violating the TCPA is $500 for each call. 47 U.S.C. § 227(b)(3)(B). If a court finds a defendant "willfully" or "knowingly" violated the prohibition, the court may, in its discretion, increase the award for such violation. 47 U.S.C. § 227(b)(3).

### *2. No ATDS was used*

As a threshold matter, Plaintiff did not plead and Cenlar did not use an autodialer or ATDS to call Plaintiff's cell phone because Cenlar does not use a telephone dialer system that has the capacity to store or produce telephone numbers to be called, using a random or sequential number, and dial those numbers. (Declaration of Justin Singmaster, hereinafter "Singmaster Decl.," ¶ 2; UMF, ¶ 6.) The dialer system used by Cenlar throughout 2019 and 2020, Harmony Version 7.1 by Noble Systems (the "System"), does not have the capacity to store or produce, using a random or sequential number generator, numbers to be called. (UMF, ¶ 7.) Instead, the only telephone numbers Cenlar and its System are able to, and in fact, dial are actual customer telephone numbers from Cenlar's files that are onboarded onto Cenlar's call lists and any telephone numbers that a Cenlar agent manually

types in the case of a manual dial. (UMF, ¶ 8.) Thus, the System neither stores nor produces numbers using a random or sequential number generator. (Singmaster Decl., ¶ 3, UMF, ¶ 9.) Accordingly, none of the telephone calls made to Plaintiff's cellular phone at issue in this matter ending in 3733 were made using an autodialer or automatic telephone dialing system which has the capacity either to store a telephone number to be called using a random or sequential number generator or to produce a telephone number using a random or sequential number generator. (Singmaster Decl, ¶ 4, UMF, ¶ 10.)

### 3. Cenlar had express consent to call Plaintiff and it was not revoked

As for Plaintiff's claim that Cenlar contacted him using "an artificial or prerecorded voice," none of the calls Plaintiff complains of in the SAC are violations of the TCPA because of the consent he had previously provided to Cenlar. Indeed, Plaintiff expressly provided Cenlar consent to call his phone and never revoked that consent in a manner which creates any liability in this case as shown below.

On October 24, 2019, Plaintiff called Cenlar and advised Cenlar not to add his cell phone number to his file. (UMF, ¶ 11.) But then, on November 15, 2019, Plaintiff called Cenlar and informed Cenlar that it could "call [him]" but he did not "want automatic dialer" calls. (UMF, ¶¶ 12-13.)

> 12·    Q·     Well, but you consented to them calling
> 13·   you, and you said you don't want an auto dialer;

14· **right?**
15· A· Right.

(UMF, ¶ 17.) Importantly, Plaintiff never advised Cenlar that it could not call him using a pre-recorded or artificial voice. (UMF, ¶ 14.) As he testified at deposition:

22· **Q· Did you ever tell them to not use a**
23· **prerecorded voice when they called you?**
24· A· Not -- I don't -- I'm not sure about
25· that either.

1· **Q· Do you recall ever telling them to not**
2· **call you with an artificial voice?**
3· A· No, I don't recall that.

(UMF, ¶ 14.)

There can be no question that when Plaintiff said to Cenlar in November 2019 "no autodialer" he understood the distinction between what TCPA claims he could bring based upon calls made using an autodialer and what TCPA claims he could bring based upon calls made using an artificial or pre-recorded voice. In fact, his SAC does not even reference an autodialer. (UMF, ¶ 5.) Instead, he claims he was called using an artificial or pre-recorded voice without his consent. (UMF, ¶ 4.) Yet, Plaintiff never used that language when communicating with Cenlar about how it could contact him. This was deliberate. Plaintiff provided express consent to call him on his cell phone and thereafter never once advised that he did not want to receive calls using an "artificial or pre-recorded" voice. (UMF, ¶¶ 14, 21.) And the law in this Circuit is clear that consent to call can be limited, *Schweitzer v. Comenity Bank,* 866 F.3d 1273, 1277 (11th Cir. 2017), as Plaintiff did when he told Cenlar "I

14

don't want automatic dialer." (UMF, ¶ 12). The case law in this Circuit also makes it clear that the caller, Cenlar in this instance, has the "burden of establishing that the purpose of its calls was within the consumer's limited consent." *Brown v. Ocwen Loan Servicing LLC*, No. 8:18-CV-136-T-60AEP, 2019 WL 4221718, at *6 (M.D. Fla. Sept. 5, 2019) (citing *Schweitzer*, 866 F.3d at 1276). Here, there is no genuine issue of material fact that Cenlar has met its burden as a matter of law as it did not call Plaintiff using an ATDS. Clearly, Plaintiff never provided the limitations on his consent he complains of in his SAC.

When it was suggested to Plaintiff that he could have at any time simply explicitly asked Cenlar to stop calling him, he admitted that he had done this in four letters prior to November 15, 2019. (UMF, ¶ 25.) But then, on November 15, 2019, Franklin gave Cenlar permission to call him but not with an autodialer:

```
 4·     Q·      You could have at any time explicitly
 5·  told Cenlar to stop calling your cell phone by any
 6·  means; right?
 7·     A·   I did.
 8·     Q·      When did you say that?
 9·     A·   I said, I didn't want any auto-dialed
10·  calls and I prefer the calls manually.
11·     Q·      Yeah.· I'm asking you when did you
12·  explicitly tell them not to call your cell phone at
13·  all?
14·     A·   When I sent the letters, four of them,
15·  that said, contact me through mail only.
16·     Q·      Okay.· So all of those letters were
17·  prior to you telling them they could call you on
18·  your cell phone on November 15 but just don't use an
19·  auto dialer; right?
20·     A·   That is correct.
```

(UMF, ¶ 13.)

Nonetheless, Plaintiff is a serial TCPA litigator, and he not only brings his claims with knowledge of the evidence he will require (and knowledge of the evidence Cenlar will need to defend) his claims,[5] but he also brings said claims with a fine-tuned knowledge of the statutes and case law surrounding TCPA lawsuits and how to entrap companies by creating confusion. Plaintiff clearly used that knowledge in an attempt to generate confusion and entrap Cenlar. Instead of clearly revoking his consent, as he had done before (UMF, ¶ 17), Plaintiff deliberately avoided providing any clear revocation or using any of the language from the TCPA which would have clarified his intent. In this case, his cunning was a bit short of success. Indeed, Plaintiff may point to a letter that he sent Cenlar just a few weeks after providing his express consent to call him to suggest that he revoked that consent, but that letter is legally insufficient as a matter of law.

On December 5, 2019, Plaintiff wrote Cenlar a letter and advised as follows: "If your company needs to call me, I *prefer* that you call manually or with a live person versus these unwanted automated generated calls to my cellphone." (UMF, ¶ 15.) In the letter, Plaintiff also vaguely refers to "unwanted automated generated calls" that he had previously received (UMF, ¶ 15), but he deliberately conflated his

---

[5] (*See* draft Memorandum of Law in Support of Motion for Sanctions, pp. 8-9, served herewith, exhibited to Cenlar's Motion for Leave.)

assessment of past calls he had received with his vague "preference" about how Cenlar should mark his file going forward.[6] Indeed, Plaintiff admitted in his deposition that he had previously explicitly told Cenlar not to call him (UMF, ¶¶ 12-13), and he instead chose to provide Cenlar with his "preference" for calls going forward while using a vague reference, not to a prohibited practice under the TCPA, but a heading found in the TCPA.[7] (UMF, ¶¶ 15-16) Critically, Plaintiff never told Cenlar that he did not want to receive calls using an artificial or pre-recorded voice. (UMF, ¶ 14.)

---

[6] In fact, Plaintiff admits that he is familiar with the TCPA requires and prohibits, and he elected not to use any of the terms therein:

```
 5·      Q·     Well, you've filed 24 lawsuits
 6·  alleging, you know, violations of the TCPA.· The
 7·  TCPA prohibits auto dialer, prerecorded voice, or
 8·  artificial voice.· Why wouldn't you use those terms
 9·  if you don't want them to call you that way?
10·      A·     I used the terms that I used.
11·      Q·     But you're very familiar with what the
12·  statute requires; right?
13·      A·     I guess you can say that.
```

(UMF, ¶ 21.)

[7] Plaintiff testified that he is aware that there are two explicitly prohibited practices under the TCPA, but when asked about his use of the phrase "unwanted automated generated" calls in the letters he sent to Cenlar, he could only point to the use of the word "automated" in the heading above the prohibited practices in the TCPA. (UMF, ¶ 23.) This is because Franklin did not want the calls to stop, but instead he wanted to file this lawsuit and needed the calls to continue. This is consistent with his strategy in his prior lawsuits. Indeed, this "vague" or purposefully obtuse "revocation" is exactly what Franklin does and has done to entrap companies.

Indeed, all of the calls complained of by Plaintiff in the SAC occurred *after* he had provided consent on November 15, 2019, and none were made using an autodialer. (UMF, ¶ 19.) And Plaintiff never effectively revoked that consent or further limited it in his communications with Cenlar. And, to be clear, he could have simply told Cenlar to stop calling at any time, and he chose not to. Why? Because, in his own words, he "told [Cenlar] what he wanted to tell [Cenlar]."

```
5·    Q·    Yes.· Why didn't you just tell them, I
6·  don't want you to call my cell phone anymore?
7·    A·    Because I told them what I wanted to
8·  tell them.· I mean, I don't know how to answer your
9·  question.
```

(UMF, ¶ 20.) And what he wanted to do with what he told Cenlar was to ensure the calls continued so that he could file his lawsuit and attempt to extort money from another company.

### 4. *Plaintiff's December 5 letter was not an effective revocation.*

This Circuit applies a common-law standard with regard to consent, as it generally dovetails with the Federal Communications Commission's view that "consumers may revoke consent in any manner that clearly expresses a desire not to receive further messages" with regard to the TCPA. *See Schweitzer,* 866 F.3d at 1278 (citation to FCC matter omitted). *See also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) ("The consumer may revoke his or her consent but in that case must clearly express that he or she does not want to receive the

messages or calls."). Here, Plaintiff never clearly revoked the consent provided. Instead, he went a step further: he was intentionally unclear.

Plaintiff admitted at deposition to studying the cases, understanding the language in the statute, and to having a thorough understanding of the interpretations issued by the FCC as to how dialers work and what could constitute violations of the TCPA. (UMF, ¶ 22.) He cannot complain of lacking an understanding of how to make companies stop calling him if the calls were in fact bothersome. In fact, in this very case, when asked why he did not explicitly tell Cenlar to stop call his cell phone, he testified that he did—but that he only did that prior to November 15, 2019. (UMF, ¶ 25.) He could have done that again on December 5, 2019, if, in fact, he wanted the calls to stop.

But he did not do that. In fact, when questioned at his deposition why he *again* sent essentially the same letter (dated December 5, 2019) in March 2020 to Cenlar, Plaintiff offered nothing of substance. (UMF, ¶ 24.) Instead, his entire deposition and the eighteen (18) TCPA lawsuits that he has filed previously[8] show Plaintiff wanted the calls to be made to him because he planned to profit from each call. In fact, when the calls from Cenlar ultimately stopped in March 2020, Plaintiff almost

---

[8] (*See* draft Memorandum of Law in Support of Motion for Sanctions, pp. 8-9, served herewith, exhibited to Motion for Leave.)

immediately provided Cenlar express consent to start calling him again on his cell phone. (UMF, ¶ 27.) This is illustrative of Plaintiff's intent and whether or not the calls he was receiving were truly "unwanted." And importantly, this fact should be considered by the Court when it evaluates whether the December 5 letter expressed to Cenlar a clear revocation of the prior consent that Plaintiff had provided. In short, it did not.

In any event, the law is clear as are the material facts of this case. Plaintiff provided consent to receive calls to his cell phone with only one caveat (no autodialer), and he never revoked that consent. Here is the exact consent:

```
14·      FEMALE VOICE:· No problem.· Are you the
15·   authorized primary user on this cell phone
16·   number?
17·      MR. RICKY R. FRANKLIN:· Yes, I am the
18·   authorized user.
19·      FEMALE VOICE:· All right.· And do we
20·   have your permission to contact you at that
21·   number in the event we need to reach you?
22·      MR. RICKY R. FRANKLIN:· Yeah.· You-all
23·   can call me.· Well, yeah, uh-huh.
24·      FEMALE VOICE:· Okay.· And please be
25·   advised that calls may be made from an
1·   automatic dialer, and what did you say the --
2·      MR. RICKY R. FRANKLIN:· Well, I don't
3·   -- I don't -- I don't want automatic dialer.
4·      FEMALE VOICE:· Okay.· All right.· So
5·   I'll go ahead and add the -- add that number,
6·   and no calls.· Okay.
7·      MR. RICKY R. FRANKLIN:· No.· I didn't
8·   say --
9·      FEMALE VOICE:· Well, no calls from an
10·   automatic dialer.· Okay.· All right.· And –
```

(UMF, ¶ 12.) Accordingly, there is no genuine issue of material fact that Plaintiff failed to "clearly express that he" did "not want to receive" calls from Cenlar using

"an artificial or prerecorded voice." *Schweitzer,* 866 F.3d at 1278; *Van Patten,* 847 F.3d at 1048. The December 5, 2019 letter does not alter this analysis.

Instead that letter: (1) referred to calls he had received in the past that he "did not consent to receive" and (2) stated a "prefer[ence]" to receive manual or live person calls going forward:

> 1. I refer to several calls I received from your company specifically on December 3rd and 4th 2019. I was called by a computer or automated message that I did not consent to receive. If your company needs to call me, I prefer that you call manually or with a live person versus these unwanted automated generated calls to my cellphone.
>
> 2. In the past I've asked your company to contact me by mail only for any correspondence.

(UMF, ¶ 16.) Yet, this December 5 letter does not "clearly revoke" any prior consent he had provided. And importantly, from Cenlar's perspective, it had never made any "automated generated" or autodialed calls to Plaintiff. (UMF, ¶ 10.) Indeed, Plaintiff's letter does not expressly say "stop" or "don't call my cell any more." Instead, Plaintiff attempts to characterize prior calls as TCPA violations: "calls that I did not consent to receive." But his characterization is wrong and confusing under the circumstances because he had actually consented to the calls which Cenlar made to him because none of the calls made by Cenlar had been made using an autodialer. (UMF, ¶ 10.) Plaintiff's attempt to establish liability for prior calls is legally

insufficient to serve as a revocation of consent. *See Schweitzer,* 866 F.3d at 1278;

*Van Patten,* 847 F.3d at 1048.

With respect to his prior consent, the December 5 letter makes no effort to modify it to include a prohibition on the use of artificial or pre-recorded voice messages.[9] There is nothing that is "expressly clear" from the December 5 letter that leads one to conclude Plaintiff had revoked his prior consent or was modifying it. Instead, all that is clear is that the serial filer Franklin chose to deliberately avoid using the phrases "artificial or pre-recorded." He knew the importance of those types of messages and that kind of language and could have clearly revoked consent to call his cellphone using artificial or pre-recorded voice messages at that time but chose not to. In fact, if Plaintiff had not intended for the calls to continue, then there is no genuine reason why Plaintiff would have sent the exact same letter to Cenlar

---

[9] As noted in Cenlar's Motion for Sanctions based upon spoliation, Plaintiff produced copies of fifty (50) alleged voicemails that he received from Cenlar, claiming that he received the first such message on December 4, 2019. (*See* draft Memorandum of Law in Support of Motion for Sanctions, pp. 10-11, served herewith, exhibited to Motion for Leave.) Yet, he destroyed the cell phone on which these alleged voice messages were allegedly received and later copied from. There are actually only two versions of the exact same message (1 with a male voice, and 1 with a female voice). (*Id.* at p. 11.) These voice messages are undated, and thus there is no way to verify, aside from Plaintiff's uncorroborated and unreliable testimony, if any of them were left before or after Plaintiff had expressly provided consent for Cenlar to call him. (*Id.*)

in March 2020 after the December 2019 letter did not cause the calls to stop,[10] and then when the calls stopped, to provide his consent to start calling him again without any limitation. As a matter of fact, he wanted the calls to continue.

In light of the foregoing, Cenlar was justified in relying upon Plaintiff's consent that it could call him on his cell phone as long as it did not use an autodialer. Indeed, Plaintiff's express consent did not preclude Cenlar from calling him using an artificial or pre-recorded voice. (UMF, ¶ 14.) Rather, his consent only precluded the use of an autodialer. (UMF, ¶¶ 12-13.) Because there is no genuine issue of material fact that Cenlar did not call Plaintiff using an autodialer, Cenlar is entitled to judgment in its favor.

## V.    CONCLUSION

For all of these reasons, Cenlar respectfully requests the Court enter summary judgment on the remaining claim asserted against, that this matter be dismissed in its entirety, and for such further relief as the Court deems just and proper.[11]

---

[10] Notably, the only evidence in this case that the December 5, 2019 letter was the actual document delivered to Cenlar on December 7, 2019 is Plaintiff's own self-serving testimony. (UMF, ¶ 18.)

[11] In accordance with Local Rule 56.1C, Cenlar has attached the original Singmaster Declaration as **Exhibit A** hereto and the excerpts of the Franklin Depo. cited to herein as composite **Exhibit B**.

81177232.16

Dated: December 30, 2021.

<div style="margin-left:40%">

**POLSINELLI, PC**

<u>*/s/ John Michael Kearns*</u>
Aaron A. Wagner
Georgia Bar No. 867812
*Email: aawagner@polsinelli.com*
John Michael Kearns
Georgia Bar No. 142438
*Email: jkearns@polsinelli.com*
1201 W. Peachtree St., NW, Ste. 1100
Atlanta, Georgia 30309
(404) 253-6000
*Attorneys for Cenlar FSB*

</div>

81177232.16

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1 (C), using 14-point Times New Roman font.

/s/ *John Michael Kearns*
John Michael Kearns
Georgia Bar No. 142438

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2021, I electronically filed the foregoing **DEFENDANT CENLAR FSB'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system. I further certify that I mailed the foregoing document by certified U.S. mail, return receipt requested, and first-class mail to the following:

Ricky R. Franklin
708 Brambling Way
Stockbridge, GA 30281

/s/ *John Michael Kearns*
John Michael Kearns
Georgia Bar No. 142438

*One of the Attorneys for Cenlar FSB*

81177232.16